IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO.: 5:12CV191-RLV

| | |
|---|---|
| **WILLIE M. BURKE,** )<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**CAROLYN COLVIN, as acting** )<br>**COMMISSIONER of Social Security,** )<br>Defendant. )<br>_____ ) | **Memorandum & Opinion** |

**THIS MATTER** is before the Court on Plaintiff Willie M. Burke's Motion for Judgment to Submit New and Material Evidence (Doc. 21), the Commissioner's Response in Opposition to Plaintiff's Motion (Doc. 24), and the Commissioner's Motion for Summary Judgment (Doc. 26).

### I.     Background

The question before the Administrative Law Judge (ALJ) was whether the Plaintiff-Claimant, Mr. Burke, was "disabled" as that term of art is defined for Social Security purposes, at any time between March 31, 2008, and the date of his decision.[1]

Plaintiff-Claimant Willie M. Burke stands around 5 feet, 8 inches tall, and weighs approximately 350 pounds with a body mass index (BMI) in the mid to upper fifties. Mr. Burke has a lengthy history of smoking. Mr. Burke has a ninth grade education. At the time of the ALJ's decision denying benefits, Mr. Burke was 48 years old. Mr. Burke's past relevant work is

---

[1] Under the Social Security Act, 42 U.S.C. § 301, *et. seq.*, the term "disability" is defined as an: inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 42 U.S.C. § 423 (d)(1)(A)).

unskilled and includes the following types of employment: dump truck driver, temporary laborer, machine operator, and lumber company stacker.

Applying the Social Security Administration's five-step, sequential evaluation process,[2] the ALJ determined at <u>steps</u> <u>one</u> and <u>two</u> that Plaintiff had not engaged in any substantial gainful activity since March 31, 2008, and did suffer from a number of severe impairments, namely, obstructive sleep apnea, asthma, and obesity. (Tr. 30). (20 C.F.R. §§ 404.1520(c) and 416.920(c)). The ALJ determined, however, that Plaintiff's impairments did not meet or equal the requirements of any listing in 20 C.F.R. pt. 404, subpt. P, app. 1, as outlined in <u>step</u> <u>three</u>. At <u>step</u> <u>four</u> of the prescribed analysis, the ALJ stated within his opinion that "a light to medium residual functional capacity [was] appropriate in light of the claimant's combined physical impairments and limitations, including obesity, which the objective medical evidence supports." (Tr. 33). However, in his Findings of Fact, the ALJ stated that Mr. Burke had the residual functional capacity to perform "the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)." (Tr. 30). Next, the ALJ found that Mr. Burke had the RFC and was capable of performing past relevant work as a dump truck driver, which is classified as medium unskilled work.[3] (Tr. 33). Accordingly, prior to reaching <u>step</u> <u>five</u>, the ALJ held that Mr. Burke was not disabled as defined by the Act. (Tr. 34).

---

[2] The Social Security Administration has established a five-step sequential evaluation process for determining if a person is disabled. Federal Old-Age, Survivors and Disability Insurance, 20 C.F.R. § 404.1520(a). The five steps are as follow: (1) whether claimant is engaged in substantial gainful activity—if yes, not disabled; (2) whether claimant has a severe medically determinable physical or mental impairment, or combination of impairments, that meet the duration requirement in § 404.1509—if no , not disabled; (3) whether claimant has an impairment or combination of impairments that meets or medically equals one of the listings in appendix 1, and meets the duration requirement—is yes, disabled; (4) whether claimant has the residual functional capacity (RFC) to perform her/his past relevant work—if yes, not disabled; and (5) whether considering claimant's RFC, age, education, and work experience he/she can make an adjustment to other work—if yes, disabled. 20 C.F.R. § 404.1520(a).

[3] The physical requirement of Mr. Burke's past relevant work as a dump truck driver is the ability to stand and walk for six hours and lift and carry up to 50 pounds for extended periods. (Tr. 33).

All administrative remedies have been exhausted and the final decision of the Commissioner is properly before this district court.

## II. New Evidence / Materiality of Treating Physician's RFC Opinion

Because Mr. Burke submitted additional evidence that was not considered by the Commissioner, the undersigned is asked to consider whether remand is appropriate under sentence six of 42 U.S.C. § 405(g), which provides:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). "Evidence is new within the meaning of [Section 405(g)] if it is not duplicative or cumulative. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Secretary, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc) (internal citations omitted).

The task presented is to "review the record as a whole, including the new evidence, and [] determine whether substantial evidence supports the [Commissioner's] findings." *Wilkins*, 953 F.2d at 96. "However, the Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence." *Davis v. Barnhart*, 392 F.Supp.2d 747, 751 (W.D.Va. 2005) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996)). Thus, when faced with new evidence, a court must reconcile its duty under *Wilkins* to review the entire record including the new evidence to determine if there is a reasonable possibility that it would change the outcome, with its obligation under *Smith* to abstain from making credibility determinations and resolving factual conflicts. *Davis*, 392 F.Supp.2d at 751.

Mr. Burke, through counsel, proffers as new evidence a one-page document dated March 31, 2011 and entitled, "Medical statement regarding physical abilities and limitation for Social

3

Security disability claim –Shorter form."[4] (Doc. 21-1). The medical statement is completed by Dr. Carla Pence, Mr. Burke's "long time treating physician." (Doc. 22-1, 2). Dr. Pence lists Mr. Burke's diagnoses as: severe COPD, severe sleep apnea, chronic lower extremity edema, and obesity.[5] Id. According to Dr. Pence, Burke has the following limitations and abilities:

1. Hours patient can work per day:           1 hour
2. Standing at one time:                     15 minutes
3. Sitting at one time:                      No limitation
4. Lifting on an occasional basis:           5 pounds
5. Lifting on a frequent basis:              None
6. Bend:                                     Never
7. Manipulation right Hand:                  Frequently
8. Manipulation left Hand:                   Frequently
9. Need to elevate legs during 8-hour workday: Most of Time

Id. The last question posed on the form is the degree of pain the patient suffers from, to which Dr. Pence responded, "None." Id. In summary, Dr. Pence opines, "Unfortunately Mr. Burke is unable to work a sedentary or manual labor job because of the above medical problems. He falls asleep frequently during the day due to his severe sleep apnea." Id.

a.

The March 2011 Medical Statement from Dr. Pence is "new" as opposed to cumulative or duplicative. In fact, Dr. Pence's suggested residual functional capacity summarizes what Dr. Pence learned about Plaintiff and his functional limitations over the course of treatment. Dr. Pence's specific opinion on Plaintiff's physical and non-exertional limitations is not found

---

[4] Hereinafter referred to as "the March 2011 Medical Statement."

[5] Chronic obstructive pulmonary disease (COPD) is a "general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied." STEDMAN'S MEDICAL DICTIONARY (2014), *available at* WestNext 253710. The ALJ did not identify COPD as one of Mr. Burke's severe impairments. The record is not informative about the relationship, if any, between COPD and the severe impairments recognized by the ALJ.

anywhere else in the record.  (*See* Tr. 274−97; 343−47).

      b.

      The March 2011 Medical Statement is likewise "material" in that it is the only medical opinion that speaks to the effect of Plaintiff's severe obstructive sleep apnea and attendant non-exertional limitations.  As discussed in greater detail below, the ALJ did not discuss any functional limitations related to Plaintiff's apnea.  The ALJ only contemplated "*physical* impairments and limitations, including obesity."[6] (Tr. 32−33).  The ALJ summarily adopted the two state agency consultants' views on RFC without explanation other than to recite that he considered their assessments appropriate.  (Tr. 33).  Most importantly, however, the ALJ observed in his written ruling that "no physician has given an opinion of disability."  (Tr. 32).  Dr. Pence's March 2011 Medical Statement does just that by opining that Plaintiff's obstructive sleep apnea interferes with his ability to function safely on a daily basis.  According to Dr. Pence, the activity level and exertional requirements of a given hypothetical job are irrelevant.

      Because the Court is required to consider the proffered new evidence in conjunction with the record as a whole in evaluating materiality, as well as in turn in determining whether substantial evidence supports the ALJ's findings, a review of the ALJ's RFC analysis and conclusion that Mr. Burke may return to his past relevant work is warranted.  *See Wilkins*, 953 F.2d at 96.

---

      [6]  State agency consultant Dr. Aregai A. Girmay performed a physical consultative examination in February 2010.  Dr. Girmay rated Plaintiff's physical (exertional) limitations as moderate to severe.  However, according to Dr. Girmay, Mr. Burke was able to walk one hundred feet without difficulty.  (Tr. 32 / Exh. 6F).  Dr. Girmay considered pulmonary function studies and concluded that Mr. Burke had "a moderately severe obstruction with a lung age of 99 years."  (Tr. 31−32).  The record is not illuminating about the significance of a given "lung age" and how such a condition might affect the claimant's RFC.

1.

The ALJ's RFC determination that Mr. Burke is capable of performing light to medium work or the full range of light work is not supported by substantial evidence on the present record. The ALJ does not adequately address non-exertional impairments or functional limitations related to Mr. Burke's life-threatening sleep apnea. The ALJ acknowledged the results of the sleep study indicating Mr. Burke's life-threatening sleep apnea yet did not find any associated functional limitation. (Tr. 31−32). Similarly, the ALJ stated that Mr. Burke's obesity "greatly exacerbates his sleep apnea and asthma." (Tr. 32). Beyond this conclusory statement, the ALJ does not explain *how* obesity factors into the RFC analysis or *how* obesity and Plaintiff's other impairments contribute to Plaintiff's limitations. (Tr. 33).

*Saulman v. Astrue* is instructive regarding how a social security disability claimant's obesity bears upon the Act's five-step sequential analysis. *See* Civil No.: 1:09CV414, 2011 WL 4351587, * 6 (W.D.N.C. September 16, 2011) (affirming the Commissioner's denial of disability insurance benefits; distinguishing *Saulman* claimant from obese claimant experiencing sleep apnea or fatigue due to obesity). "An ALJ is to consider a claimant's obesity throughout the sequential process." *Saulman*, 2011 WL 4351587, * 5 (citing Soc. Sec. Ruling (SSR) 02-1 p at *3). "Obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." *Id*. As explained in *Saulman*,

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected. The effects of obesity may not be obvious. ***For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day***. Obesity may also affect an individual's

social functioning.

*Saulman*, 2011 WL 4351587, * 6 (quoting SSR 02–1 p at * 6) (emphasis added).

Here, in support of the RFC assessment, the ALJ relied on the opinion of non-examining medical consultant, E. Woods, M.S., M.D., who opined that Mr. Burke was capable of performing his past relevant work as a Dump Truck Driver, classified as medium work.[7] (Tr. 84). Specifically, Dr. Woods was of the opinion that Mr. Burke was physically capable of the following:

> *Occasionally (cumulatively 1/3 or less of an 8 hour day) lifting and / or carrying (including upward pulling) 50 pounds,
>
> *Frequently (cumulatively more than 1/3 up to 2/3 of an 8 hour day) lifting and / or carrying (including upward pulling) 25 pounds,
>
> *Standing and / or walking (with normal breaks) for a total of about 6 hours in an 8 hour day,
>
> *Sitting (with normal breaks) for a total of about 6 hours in an 8 hour day,
>
> *Pushing and / or pulling (including operation of hand and/or foot controls) unlimited.

(Tr. 83−84). Dr. Woods found no postural, manipulative, visual or communicative limitations but did find that Mr. Burke should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, etc. (Tr. 84−85). With the exception of the environmental limitation, Dr. Woods does not explicitly address non-exertional impairments. Within the section of the form entitled, "RFC – Additional Explanation," Dr. Woods recites the following:

> Allegations are partially credible. In 10/08 polysomnography sig for severe OSA

---

[7] There were actually two non-examining state agency consultants who provided input on RFC. The ALJ's decision referred to and adopted both as the underlying bases for his RFC determination. The other consultant, Jessie Harris, SDM, found Mr. Burke capable of returning to his past relevant work as a Machine Operator. (Tr. 76). The identical language used by Dr. Woods is found under the section entitled, "RFC – Additional Explanation." (Tr. 75). The Commissioner does not even cite to that portion of the record in support of its substantial evidence argument. (Doc. 26, 6).

> w/an apnea / hypoapnea index of 147.2. In 5/09 OSA noted to be better w/
> CPAP. At 2/10 ICE cl underwent PFS; values not LL in relation to cl's ht of 68".
> Cl. did have dec. breath sounds however no wheezing. He had +2 nonpitting
> edema on both legs, L > R. LOM B/L knee flex to 90 deg. The remainder of his
> PE was grossly intact.

(Tr. 85). Dr. Woods opines that Mr. Burke's allegations are "partially credible," while simultaneously confirming severe obstructive sleep apnea, decreased breath sounds, and edema. Id. While the meaning is unclear, context suggests that the "RFC – Additional Explanation" comments may bear upon the consultant's overall view of Mr. Burke's severe impairments and actual functional limitations.

The ALJ looked to Mr. Burke's credibility after determining that objective medical evidence did not support a finding that Mr. Burke was disabled under the Act. (Tr. 32). In finding Mr. Burke only partially credible, the ALJ relied heavily on Mr. Burke's history of noncompliance with recommended treatment. "In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief...." *Saulman*, 2011 WL 4351587, * 8 (citing *McKenney v. Apfel*, 38 F.Supp.2d 1249, 1259 (D.An.1999) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir. 1991)); s*ee also Brooks v. Colvin*, 2013 WL 5302566, * 5−6 (W.D.N.C. September 19, 2013) (claimant's failure to comply with weight-loss treatment plan) (citing *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir.1994) ("an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility") and *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (evidence concerning lifestyle of claimant, who ignored physician's recommendations to lose weight and stop smoking, sufficiently supported ALJ's finding that claimant's complaints of intractable pain

were not fully credible)). Here, the ALJ properly considered Mr. Burke's failure to lose weight and quit smoking despite the recommendations of his treating physicians as probative of Mr. Burke's credibility and assessment of functional limitations. (Tr. 32). It is undisputed that Mr. Burke had some success with the use of prescribed continuous positive airway pressure (cpap) and bi positive airway pressure (bipap) machines. However, Mr. Burke did not use his machines consistently and lost the benefit of his cpap machine for a period of time due to an issue with Medicaid. Mr. Burke ceased smoking for three months yet could not sustain it. As of the date of his hearing before the ALJ, Mr. Burke had reduced his smoking to ten cigarettes a day. To his detriment, Mr. Burke was not successful in his attempts to lose weight or to quit smoking altogether.[8]

With respect to Mr. Burke's daily activities, the ALJ stated that Mr. Burke "loaded the washer and dryer, swept and dusted, washed dishes all performed for short periods of time due to easy fatigue." (Tr. 32). Mr. Burke testified at his evidentiary hearing that with the physical exertion involved in household chores, including walking, he experiences pain in his legs. (Tr. 53, 55). The ALJ also noted that Mr. Burke drives his kids to school. (Tr. 32). The ALJ found Mr. Burke's testimony "not entirely credible as he has returned to smoking despite admonitions from his doctors to stop." (Tr. 32). The ALJ then noted that the use of the prescribed machines to control his sleep apnea "combined with weight loss and cessation of smoking would greatly improve his quality of life . . . ."[9] (Tr. 32).

---

[8] This is not a case, however, where the claimant failed to consistently seek medical treatment and relief for his alleged impairments. In any event, this aspect of the record is only one factor in determining Mr. Burke's credibility as it relates to his RFC.

[9] It also appears that the ALJ's failure to address obesity and any related functional limitations more specifically may have been influenced by Mr. Burke's noncompliance.

9

2.

The ALJ's finding that Mr. Burke is capable of performing past relevant work is also not supported by substantial evidence on the present record. On October 26, 2008, a sleep study (nocturnal polysomnogram) was conducted by Dr. Todd at Summit Sleep Disorder Center, P.A. In October 2008, Dr. Todd designated "Excessive Daytime Sleepiness" as one aspect of Mr. Burke's Axis C diagnosis.[10] (Tr. 251). Excessive daytime sleepiness is measured by what is called an Epworth Sleepiness Score. Epworth Sleepiness Scores of *10 or greater* are indicative of excessive subjective daytime sleepiness. (Tr. 245). Mr. Burke's original Epworth Sleepiness Score in October 2008 was 19/24 – nine points beyond 10, the benchmark for determining if excessive daytime sleepiness is a problem. In December 2008, Dr. Todd reported that claimant's Epworth Sleepiness Scale "remains high at 17/24." (Tr. 246). Dr. Todd reported that Mr. Burke's Epworth Sleepiness Scale was 15/24 in January 2009. (Tr. 245−46).

Objective medical evidence supports Dr. Pence's opinion in the March 2011 Medical Statement that Mr. Burke suffers from excessive daytime sleepiness. According to the Commissioner, even if the Court was inclined to remand, it would be futile since Dr. Pence's own treatment notes do not support the limitations within her March 2011 Medical Statement. This argument is not well taken. As an initial matter, because Dr. Pence was Mr. Burke's treating primary care physician, she had access to the other medical evidence prepared by other physicians evaluating and / or administering specialized treatment to Mr. Burke. For example, the results from the October 2008 sleep study, as well as Dr. Todd's subsequent office visits and treatment of Mr. Burke, were summarized in written form and shared with both Drs. Deddens

---

[10] Mr. Burke's primary or Axis A diagnosis was deemed "Obstructive sleep apnea, very severe, worse during REM sleep." (Tr. 249). The secondary or Axis B diagnosis was "Split-night polysomnogram with CPAP titration." (Tr. 249).

and Pence.[11] (Tr. 245−46, 250−51). Secondly, Dr. Pence personally observed the effects of Mr. Burke's apnea, namely, his excessive daytime sleepiness. In December 2009, Dr. Pence saw Mr. Burke in her office and admitted him to the hospital during an acute episode of respiratory failure and bronchitis. (Tr. 318−21). On that occasion, an extreme example, Dr. Pence noted that Mr. Burke was "very difficult to rouse" and that it required "the Nurse Practitioner, patient's wife, and [Dr. Pence] some effort to rouse him up enough to walk back to his car, so his wife could drive him to the hospital for admission." (Tr. 318−19). The Iredell Memorial Hospital records from December 2009 indicate that prior to admission, Mr. Burke had become increasingly somnolent.[12] In other words, Dr. Pence's assertion finds support in Mr. Burke's Epworth Sleepiness Scores which were analyzed by Dr. Todd and produced for Dr. Pence's review. Therefore, Dr. Pence's functional limitation based upon Mr. Burke's severe sleep apnea, namely, the limitation stating that Mr. Burke "falls asleep frequently during the day due to his severe sleep apnea," is supported by Dr. Todd's records and results.[13] (Tr. 244−46).

With respect to past relevant work, Mr. Burke's testimony at the evidentiary hearing was less than helpful. The ALJ accepted Mr. Burke's representation that he could potentially return

---

[11] Dr. Deddens, who had previously evaluated Mr. Burke for potential tonsillectomy and adenoidectomy due to enlarged tonsils and adenoids, referred Mr. Burke to Dr. Todd for a sleep study. Dr. Todd's initial consultation report documents a discussion had about Mr. Burke's excessive sleepiness and driving in bold print, wherein Dr. Todd writes, "As above, he[Burke] agrees to refrain from drowsy driving. (Tr. 251). Granted, according to Dr. Todd's treatment notes, Mr. Burke denied that he drove when feeling excessively sleepy. The Court questions how an individual with life-threatening sleep apnea, and excessive subjective daytime sleepiness is capable of driving a dump truck (off road or not) eight hours a day.

[12] The term "somnolent" is defined as "inclined to or heavy with sleep: drowsy." *See* www.merriam-webster.com/dictionary/somnolent (last viewed September 4, 2015); *see also* Stedman's Medical Dictionary, 829010 (2014) (defining "somnolence" as "an inclination to sleep; a condition of obtusion.")

[13] Notably, the ALJ assigned Drs. Todd, Deddens, and Pence "greater evidentiary weight." (Tr. 33).

11

to driving an off-road dump truck. Mr. Burke was generally agreeable and answered most of the questions posed by the ALJ and his attorney in the affirmative. (Tr. 54). After being asked by the ALJ whether he could ever return to driving an off-road dump truck on a full-time basis (for eight hours a day, five days a week), Mr. Burke testified, "I probably could." (Tr. 54). Later, Mr. Burke stated that he really didn't know what type of work he could or could not sustain because he had been out of the work force for so long. (Tr. 55). The Commissioner focuses on Mr. Burke's statement that he is capable of driving a truck on a full-time basis and suggests that the one statement is determinative of disability.

Given the severity of Mr. Burke's obstructive sleep apnea, and the fact that the ALJ failed to discuss any non-exertional limitations related to this severe impairment in fashioning the RFC, the Court is constrained to hold as a matter of law that there is no reasonable possibility that the March 2011 Medical Statement would have changed the outcome. Therefore, the Court finds that Dr. Pence's RFC opinion is "material" to the Commissioner's evaluation of Mr. Burke's RFC and the Commissioner's final decision that Mr. Burke is capable of returning to his past relevant work.[14]

c.

The March 2011 Medical Statement falls within the relevant time period since it was prepared between Mr. Burke's alleged onset date and issuance of the ALJ's decision.[15] Mr.

---

[14] The Commissioner suggests that if the Court remanded the matter for additional proceedings, the ALJ would likely disregard Dr. Pence's opinion on this point. In any event, it is not for this Court to consider the evidence in the first instance, weigh the new evidence, and resolve factual questions in the record evidence. *See Davis*, 392 F.Supp.2d at 751.

[15] The regulations provide: "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it related to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404 .970(b). *Poor v. Comm'r of Social Security*, 2015 WL 3938313, * 3 (W.D.Va. June 26, 2015).

Burke's alleged onset date is March 31, 2008. The evidentiary hearing before the ALJ was held on April 5, 2011. At counsel's request, the ALJ agreed to leave the record open for two weeks beyond April 5, 2011 to permit Burke's attorney to submit records from Dr. Hyat, "a new breathing specialist" Mr. Burke had recently begun seeing.[16] (Tr. 42). The ALJ's decision denying benefits issued May 25, 2011.

d.

Finally, with respect to good cause, counsel assumes full responsibility and explains simply that he inadvertently omitted this document when he submitted supplemental materials to the Commissioner. According to counsel:

> Prior to the ALJ hearing of April 5, 2011, counsel for the plaintiff had submitted additional evidence from Dr. Pence for the period through 3/11/11[sic] but failed to include the 3/31/11 one page medical statement although it had been previously requested. This failure to subsequently submit this report was not detected until recently upon review of the transcript in preparation of the plaintiff's motion for summary judgment and brief. Plaintiff's counsel cannot determine when receipt of this medical statement occurred although it is believed that it was while this claim was still before the defendant.

(Doc. 21). In short, counsel mistakenly believed the March 2011 Medical Statement he requested from Dr. Pence was before the Commissioner.[17] Mr. Burke demonstrates that good cause exists for his failure to present the March 2011 Medical Statement from Dr. Pence earlier.

---

[16] For reasons unknown to this Court, it does not appear that Dr. Hyat's records were ever produced or included within the administrative record.

[17] Another observation weighing in favor a liberal construction of good cause here is the lack of advocacy provided by Plaintiff's counsel. Mr. Burke's appeal was almost dismissed in September 2013 for lack of prosecution after counsel failed to submit any dispositive motion on Mr. Burke's behalf. (Doc. 16). In addition, counsel inexplicably never supplemented the administrative record with Dr. Hyat's records despite his request to do so and the two week delay in closing the record. The undersigned is reluctant to prevent Mr. Burke from having his claim for disability insurance benefits squarely decided by the Commissioner with all of the material objective medical evidence before it.

Finally, on June 8, 2015, the parties advised the Court that they agreed that *Mascio* did not require sentence four remand. (Doc. 29). The undersigned is aware that certain boilerplate language concerning Mr. Burke's credibility and his RFC challenged within *Mascio* is found within the ALJ's decision.[18] (Tr. 32).

### III. Order

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Judgment to Submit New and Material Evidence (Doc. 21) is hereby **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**; and the Commissioner's denial of benefits is **VACATED** and **REMANDED** pursuant to sentence six of 42 U.S.C. §405(g) for rehearing or any other administrative proceedings that may be appropriate.

Signed: December 7, 2015

Richard L. Voorhees
United States District Judge

---

[18] The ALJ's decision at page five reads:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.